UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 2:16-cr-115 |
| | ) |
| JOEL PASTERNAK | ) |

UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through NANCY STALLARD HARR, United States Attorney for the Eastern District of Tennessee, submits that the presentence report for Joel Pasternak correctly describes the pertinent sentencing factors of 18 U.S.C. § 3553(a). The probation officer prepared a thorough and well-written report. The defendant pled guilty to eight counts in the indictment pertaining to Schedule III controlled substances: this included one count of conspiring to distribute and possess with the intent to distribute anabolic steroids, one count of possessing precursors used to manufacture anabolic steroids, five counts of aiding and abetting the maintaining of a place for the purpose of manufacturing, distributing, or using anabolic steroids, and one count of conspiring to launder money.

**1a.** **The nature and circumstances of the offense.**

*Summary of the Pasternak Steroids Conspiracy Investigation*

This investigation began in late 2012 and included Special Agents, Task Force Officers, and others of the Drug Enforcement Administration, Internal Revenue Service – Criminal Investigation, Homeland Security Investigation, and the United States Postal Inspection Service. JOEL PASTERNAK led a large criminal organization which imported raw steroid products from China, manufactured injectable and oral steroid products for sale and distribution via the internet, and laundered nearly $3 million in criminally-derived proceeds.

The Pasternak organization was an international web-based drug trafficking organization which used a website and invitation-only message-boards and forums. The scheme crossed many state lines and involved a fairly detailed organization which segregated duties among more than thirty individuals to avoid detection. Pasternak relied almost exclusively on the United States Postal Service to receive raw steroid precursors, to ship finished products to customers, and to ship large amounts of cash. Approximately $2.5 million was laundered through Western Union, using a whole series of false identities and addresses. The vast majority of sales were made to customers outside the Eastern District of Tennessee, making investigation and prosecution by state court authorities difficult. Pasternak pursued extensive means to conceal the manufacture and distribution of anabolic steroids and to conceal the proceeds from the illegal activity.

Investigative techniques included witness and defendant interviews, surveillance, vehicle trackers, phone pings, pen registers, toll analysis, text message search warrants, email search warrants, package search warrants, property search warrants, trash pulls, pole cameras, IP address exploitation, administrative subpoenas, grand jury subpoenas, Fusion Center information, undercover purchases, hand to hand purchases, Postal Service surveillance and investigative techniques, computer forensic examinations, and internet purchases. The agents completed a very extensive analysis of thousands of financial records in order to establish the extent of the criminal money laundering.

*The Conspiracy*

PASTERNAK ordered and received anabolic steroid powders directly shipped from China in misbranded packaging. The packages were delivered by the United States Postal Service and the packaging variously described the contents as hair bleach, wall painting

additives, and cosmetics (all of which are not regulated).  In reality, the packages contained one to two pounds of raw anabolic steroids.  Pasternak operated five clandestine laboratories where the raw steroids were mixed with other substances and repackaged in vials, powders, and tablets for individual consumption.  Pasternak marketed the end products to individuals who live outside the Eastern District of Tennessee, using the United States Postal Service to complete the shipment.  Online consumers were directed by the website to direct payment to Western Union and MoneyGram.

Pasternak recruited individuals to fill roles in the operation. **Product Receivers** received shipments of raw anabolic steroids from the People's Republic of China, opened the packages, and then reshipped them as directed by Pasternak.  **Lab Workers** opened the shipments of raw product from China, mixed the anabolic steroids with other substances, repackaged the mixed substances, and shipped the anabolic steroids products to consumers. They were paid an hourly wage and Pasternak monitored their time using a factory-like time clock. **Money Receivers** retrieved funds from third-party financial processors Western Union and MoneyGram and shipped the cash proceeds as directed by Pasternak.  They received a commission of the funds they retrieved as compensation for their services. **Web Managers** designed and managed the websites which were Pasternak's sole means of marketing and receiving funds from the illegal steroids sales.  The websites used for most of the scheme's existence included [www.hulksteroids.com](www.hulksteroids.com); [www.hulkbody.com](www.hulkbody.com); and [www.eroids.com](www.eroids.com).  Pasternak selected The Incredible Hulk as the brand for his products and repeatedly used the Incredible Hulk image/likeness on the packaged products.  A select few ordered and purchased vials and other supplies used to convert the raw steroid powders to consumer products, package, and ship the products to consumers.  Pasternak's parents, Edward and Lori Pasternak purchased

sites which were converted to clandestine steroids labs and concealed Pasternak's ownership of the properties. Edward Pasternak was an organizer and manager of persons involved in the conspiracy and acted as the scheme's banker, holding large sums of cash for the organization. Most of the defendants occupied multiple roles. With a few exceptions, most of the defendants were college students or otherwise affiliated with East Tennessee State University.

*July 7, 2015 Searches*

On July 7, 2015, agents executed three federal search warrants at 300 Castlewood Drive, Johnson City, TN; 24 Lake Village Court, Johnson City, Tennessee; and 160 Country Path Road, Newport, Tennessee. At 300 Castlewood Drive (the residence of Maxwell Hensley), the agents found numerous powders, vials of liquid, a marijuana grow, weapons, and electronic devices. At 24 Lake Village Court (the residence of Joel and Joshua Pasternak), the agents found money counters, vials of steroids, "Hulk" wall hangings, U.S. Currency, bamboo brushes (consistent with brushes previously found in package search warrants), and media devices. At 160 Country Path Road (the residence of Ed and Lori Pasternak), the agents found U.S. Currency, money bands, bank bags, vials of liquid, computers and thumb drives (inside the house and in the creek).

On July 7, 2015, the agents conducted a consensual search of 1812 E. Millard Street, Johnson City, TN, where they found thousands of vials of finished steroid product, numerous backs of steroids capsules, approximately 19 kilograms of raw steroid powder, an AutoClave sterilizing machine, a time clock, a complete large scale manufacturing laboratory for anabolic steroids, shipping materials, and packaging materials. On July 7, 2015, agents conducted a consent search at 186 Milligan Lane (the residence of Pamela Little), Johnson City, TN, where they found assorted pills, electronic devices, and digital scales.

On July 7, 2015, agents interviewed Thomas Maxwell Hensley, Kari Carter, Lauren Dean, Joel Pasternak, and Edward Pasternak. On July 10, 2015, agents seized a 1993 Mastercraft boat from Rockingham Marina in Gray, TN, that belonged to Joel PASTERNAK. On July 15, 2015, agents interviewed and obtained the confession of John Allen in Seminole, Florida. On August 5, 2015, agents interviewed and obtained the confession of Heath Kershaw as to his activities of the Pasternak organization. On September 10, 2015, agents interviewed and obtained the confession of Abigail Chester, in Farmington, NM. On October 9, 2015, agents interviewed and obtained the confession of William Gallant in Sevierville, TN. On October 27, 2015, agents interviewed and obtained the confession of Mitchell Austin Free in Georgia. On November 3, 2015, agents interviewed and obtained the confession of Richard McKinley Hensley. On January 13, 2016, agents interviewed and obtained the confession of Lindsey Smallman as to her role in the Pasternak organization.

*First Nine Defendants*

Nine defendants pled guilty via information and written plea agreements. These included John Allen, Lauren Dean, Thomas Maxwell Hensley, Glenn Jenkins, Heath Kershaw, Matfey Lisovoy, Pamela Little, Nathan Urrutia, and Michael VanLeeuwen. The grand jury returned an indictment on October 12, 2016, charging Daniel Boston, Kari Carter, Abigail Chester, Mitchell Free, William Gallant, Richard Hensley, Christopher Jones, Edward Pasternak, Joel Pasternak, Jared Pasternak, Joshua Pasternak, Lori Pasternak, and Lindsey Smallman.

*Scope of the Conspiracy*

The conspiracy began in 2012 and ended on September 30, 2015. The agents seized approximately 71 kilograms of 27 different kinds of Schedule III anabolic steroids on July 7, 2015. As noted in the attached summary of drug trial exhibits, this quantity of drugs does not

reflect all of the drugs seized or any of the drugs sold by the conspiracy prior to July 7, 2015. The United States arranged for Wade Voigt to testify at the May 30, 2017 trial; Mr. Voigt is the owner of two companies which sold glass vials to the conspiracy. He was prepared to testify that the conspiracy purchased 84,922 vials from him during its course.

The United States can prove through financial records that the conspiracy derived more than $2.8 million in sales income, in literally thousands of transactions. The examination of Joel Pasternak's main laptop computer found more than 60,000 emails related to the conspiracy. In sum, this was an extensive, vertically-integrated criminal conspiracy which used internet-based mass marketing targeted at an affinity group of steroid users. It imported illegal steroids from the People's Republic of China through the United States mails.

*Defendant's Role in the Conspiracy*

Joel Pasternak was the creator and director of the conspiracy, which involved at least twenty-two individuals, five clandestine steroids labs, more than $2.8 million in criminally derived proceeds, and literally thousands of transactions. Pasternak devised a scheme which imported raw steroid powders illegally from China shipped in misbranded packaging, converted them to consumer products at clandestine labs, and sold them on the internet through a series of concealed transactions and alias identities. It was a cash business, which precluded the use of bank accounts and prohibited Joel Pasternak from conducting legitimate financial transactions in his own name. Pasternak used individuals at every level and segment of the organization, including four members of his family, four young men who have known him since middle school, girlfriends, acquaintances, and complete strangers he met through the internet. He acquired real and personal property titled in the names of others (including his parents) as part of

the scheme which included money laundering. Unlike most of the co-conspirators, Joel Pasternak was involved in the scheme's financial side and the production side.

*Sentencing Factors*

**1b. <u>The history and characteristics of the defendant.</u>**

The pre-sentence investigative report described Pasternak's history and characteristics. He has a limited prior criminal history and no indication that he would become the leader of an extensive drug and money laundering organization.

**2A. <u>The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.</u>**

Because the offense involves Schedule III controlled substances, the offense is inherently less serious than Schedule II or I drug crimes. However, the conspiracy sold defective steroids products to consumers, many of whom suffered serious bodily injury from injecting and ingesting the substances. The raw product was shipped illegally to the United States. The organization laundered a fairly large amount of illegal drug proceeds through a fairly sophisticated scheme which involved dozens of false identities and the use of thousands of communications sent over the internet. The offense is serious because of its scope and breadth. All of the conspirators knew that their activities were illegal, demonstrating they lacked respect for the law.

**2B. <u>The need for the sentence imposed to afford adequate deterrence to criminal conduct.</u>**

Deterrence in this instance is limited to general deterrence. A guideline sentence will deter others from similar conduct.

**2C. <u>The need for the sentence imposed to protect the public from</u>**

**further crimes of the defendant.**

The United States is unable to project the likelihood of the defendant's recidivism.

**2D.     The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need for the sentence to incorporate this factor.

**3.      The kinds of sentences available.**

The probation officer has correctly described the sentencing options available.

**4.      The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.**

The presentence report correctly describes the maximum sentence.

**5.      Pertinent policy statement.**

There is no pertinent policy statement cited by the United States.

**6.      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

A guideline sentence will avoid unwarranted sentence disparities.

**7.      The need to provide restitution and order a monetary fine.**

As noted in the presentence report, restitution is not relevant. (PSR ¶ 97). The defendant appears to have the ability to pay a fine.

## SUMMARY

Mr. Pasternak should be held accountable for the scope of his conduct. His behavior has adversely affected his parents, brothers, and other young people. He abused a position of trust in order to ensure a steady supply of illegal anabolic steroids for his personal consumption and for

purposes of greed and control. He went to great lengths to conceal the illegal scheme and his role in the scheme. The advisory range calculated by the probation officer properly reflects Mr. Pasternak's role in the offense. The defendant has objected to some guidelines-related enhancements. The United States will meet its burden of proving the advisory range calculated by the probation officer. Once the Court arrives at a final range and consistent with its plea strategy, the United States recommends a mid-range sentence of imprisonment plus an appropriate period of supervised release, which is fair and just in light of the circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, to promote respect for the rule of law, and to afford adequate deterrence to others. There is no basis to vary or depart downwardly.

RESPECTFULLY SUBMITTED,
NANCY STALLARD HARR
United States Attorney

By: *s/ Helen C.T. Smith*
      Helen C.T. Smith
      Assistant United States Attorney
      220 W. Depot St., Suite 423
      Greeneville, Tennessee 37743
      Tel. 423-823-5020

Certificate of Electronic Filing and Service

I certify that I electronically filed the foregoing sentencing memorandum on September 7, 2017. I have provided a copy of the memorandum to the probation officer who prepared the presentence report and to the defendant's attorney.

*s/ Helen C.T. Smith*